Good morning, your honors. May it please the court. My name is Matthew Hoppeck. I'm here representing Anthony Alphonsus, who is a native of Bangladesh, formerly East Pakistan. He was a permanent resident of the United States until he was convicted of several crimes that rendered him deportable. After he was ordered or found to be deportable, he sought protection in the United States under the Withholding of Removal and Convention Against Torture statutes and regulations. He gave credible testimony that he had faced torture in Bangladesh as a Pentecostal Christian, but the agency found that he was ineligible for withholding of removal because he had been convicted of several crimes, but the most important was resisting arrest under California Penal Code 69. The agency concluded that resisting arrest, or in this case fleeing from a police officer, was a particularly serious crime that under the immigration statute would give the agency what it considers discretion to not let him apply for withholding of removal, the mandatory non-refoulement section of our immigration statute, and thus essentially he's going to be ordered removed. Doesn't the ARBID case now hold that there is discretion and that we review only for abuse of discretion? It does, Your Honor, and I don't think this panel can reverse that. We continue to argue that because withholding of removal is not discretionary, it would be a strange result for the agency to be able to use its discretion as a hurdle for somebody to get to withholding of removal in that the final result is not discretionary, but I agree with you. ARBID decides the case on this. Actually, we have a set of, another set of cases which provide that when you're talking about withholding, if the crime that you're talking about is not the same crime that barred removal, that there is, that the, actually this is a different issue, I'm sorry, no, let's scratch that. So ARBID is about abuse of discretion. The question is, you're also essentially challenging the whole administration of the particularly serious crime provision. We are. And to me the problem here is the reason, the language doesn't sound particularly discretionary. It's just because there are no standards that it becomes so amorphous. I mean, is that essentially what you're saying? That's essentially what we're saying, and the best example is the most recent board decision. We filed a 28-J letter about it called Matter of R.A.M. A single, I'm sorry, a panel of the board published a decision about two months ago that said possession of child pornography is not per se a particularly serious crime. But then the board reasoned that by its nature it's so harmful to its victims that it's a particularly serious crime. We don't see how the board can distinguish between what is per se a particularly serious crime and what is by its nature a particularly serious crime. We've thrown our hands up in the air and are just, at the end of the day, confused. There are also several cases where the board applies one standard in one case and then goes back and says that doesn't matter anymore in another case. In the Matter of L.S. case regarding human smuggling, the board's panel said the risk of harm to potential victims was not a factor because nobody was actually injured. And yet in the case before this court, the only factor the board found, the main factor the board found was positive was the risk of harm to the public that he created a meaningful risk of harm. Well, the board actually looked at several factors, case-by-case analysis, looking at the nature of the conviction, the circumstances and underlying facts, and the sentence. They did look at all of those factors. Or at least they said they were looking at all those factors. I believe in the board's decision in this case, the board listed the sentence as one of the factors that it was supposed to consider. But if you then move to the analysis, it doesn't mention his sentence. And in fact, the record in this case shows he received what would be considered the lesser sentence. And so the scheme, I think, is flawed because the agency has had multiple chances to interpret it or provide a reasonable framework in which aliens who are pleading guilty to crimes can predict this is going to be a particularly serious crime. Is that the issue? I mean, people don't really go around committing crimes based on whether they're going to be able to get a waiver of deportation, it seems to me. That's true. But the problem is that you have complete discretion in the agency, just unbridled, because there doesn't seem to be any center. I mean, somehow, in order to have a concept mean anything, there has to be some central meaning to it. And here, particularly serious crime, the words don't necessarily sound all that vague, particularly looked at in terms of the treaties and the history of the treaties. But the way it's actually been enforced, it just seems to be whatever we say it is. Well, I think the statute gives a standard. The statute talks about dangerousness. And the convention and the protocol both talk about dangerousness. But our cases, starting with Ramirez-Ramos here, and the agency multiple times has said, we don't have to think about dangerousness. Well, in this case, we had a bond hearing. The agency said, you are not dangerous. Here's a $25,000 bond order. And so in cases where the alien is not at all dangerous, it does seem the court, even though the panel decision in Ramirez-Ramos says they don't have to make a dangerousness finding, that would be a good center to start with. Well, so you don't have to really have two steps. In other words, it isn't so much that – it's more that, as I understand what you're saying, or what appears to me the statute means, is that the particularly serious crime, in order to – the first thing you know about it, it has to be something about that makes people dangerous, rather than in the other direction. I mean, what they seem to be saying now is, if we call it a particularly serious crime, then you're dangerous. Rather than, in order to know whether it's a particularly serious crime, we have to know whether it's the kind of crime as to which people are dangerous. And I think the Judulene decision that just came from the Supreme Court, I think soundly supports that notion. Because the panels – the majority's decision said, when the agency uses its discretion, but considers factors that don't relate to the alien's fitness to reside in the country, then it has abused its discretion. Fitness to reside, I think, is equated to dangerous. And the Judulene court said, you're abusing your discretion if you're not considering this person's fitness to reside here. Specifically, what statutory section or subsection are you relying on to say that there's a statutory standard definition of particularly serious crime? It's not defined in the statute, but the – That's why I'm asking. I wasn't sure what you were referring to. The particularly serious crime statute says, particularly serious crime such that the alien is a danger to the community, I believe. Let me pull the statute. Tell me what section you're looking at. Okay. I don't have the citation on hand. Well, if you find it in time to – I will. Give it to me on rebuttal, that's great. Otherwise, give a note to the deputy clerk. I will. The other issue – Or try and talk about how all this applies to this case. It seems to me, however, that if you were looking at a statutory – if you were to try to narrow and crystallize the meaning of the statute by pulling the dangerousness provision into the concept, which seems to make sense, I'm not sure that you're – If one relies here, as the case law has recently done, on more material than just the conviction material, I'm not sure if your client wins in the sense that what he did appear to be, you know, credibly to make him a somewhat dangerous person. I think the record isn't entirely clear, and there are a few reasons. One, the agency said it was especially dangerous that he ran through traffic. I don't think the court can make a finding that running through traffic makes one a – You're picking it apart. They said that he ran through traffic in order to evade the arrest, that he assumed a fighting stance with the police officer and shoved the police officer when the officer was trying to arrest him. That was a constellation. And so you have to look at it as a totality. It's true. But when looking at the record, in our opinion, there was an eyewitness. And in the police report, the eyewitness does not report seeing him take a fighting stance, does not say he saw him push the officer. What it does say, and the police officer's account even says this, he stopped running, turned around, put his hands up, and then got shot with a taser. I agree that running away from a police officer is not a great thing to do. Well, in terms of the factual predicate for this discussion and assessment of whether these facts are sufficient to call it a particularly serious crime under the standard that we review it, don't we have to give deference to those factual findings if there's evidence to support it? I do. I do think so. The court has also taken judicial notice, however, of the bond proceedings in which a new hearing was conducted, new evidence and testimony were taken, and the agency made a specific finding that you are not a dangerous person. Well, there's a question whether that's relevant to what the agency did because it had what it had in front of it. And whether we are allowed to look at that for purposes of reviewing this is a question in my mind, at least. Because what we're looking at is whether the agency made a mistake given what was in front of it, the administrative record that it had at the time. Right. So is there any evidence in your view to support the factual findings that were underlying this discussion? There is evidence that he ran from a police officer. I think there's evidence that he may have pushed the police officer, although to us the record is not clear. You're right that the court, any reasonable fact finder, if they could reach that conclusion, well, then the court has to defer to that finding. We think even if he had, in running away from the police officer, it appears there's a scuffle, the police officer was not injured. The police officer was on a motorcycle. Originally, but I think the police officer was running after him on foot afterward. I know, but he chased him. That's right. I mean, it was not a police officer that was some scene where this right aid offense took place that he ran from. He was running away and the police officer saw someone running and went after him and tried to stop him. And then after he made some attempts, he got off his motorcycle and then ran after him. That's correct. I come back to the board's decision in matter of L.S. Although it's old, the board has never disavowed it. In fact, it cited matter of L.S. in its main decision, matter of N.A.M. It's the main one the court now defers to. Matter of L.S. was a panel decision about human smuggling. And the board came back to this question of, yes, individuals are regularly injured in this human smuggling scheme. But in this case, nobody was injured. And so even though there is potential for harm, in this case, there was no actual harm. We think the board published a decision and then in our case presently has gone away from that decision by saying, the legal standard they've set out is you created a meaningful risk of harm. The court, I think, has to defer to the published decision and would give, at a minimum, skid more deference to the unpublished decision here. If all you've got is a meaningful risk of harm, how do courts – I don't know how courts review that. Because any crime, any crime happening out in public or on the street would create a meaningful risk of harm. But it doesn't appear there's evidence that anyone was even – You haven't mentioned Frantescu. Is there a reason that you haven't mentioned Frantescu? Frantescu – no, there's not a reason. Frantescu is the main agency decision on this question. But Frantescu, it seems to me, says what a particularly serious crime isn't. But it doesn't say what – it has some factors. But it doesn't say what you're trying to prove with those factors. It says you look at this, that, and that, and then what? And I think the board has been sincerely confused about Frantescu since it was published in the 80s. Because Frantescu gives us the factors, but then you have a long line of cases where the board has said, this one's not important. And then later they said, this one is not important, but that is. They've talked about sentence back and forth. At one point they said the sentence really isn't that important. And now in their published cases they're saying the sentence is important. They've said the distinction between a felony and a misdemeanor might be important. They've said whether the person was harmed or whether there's a risk of harm might be important. Well, what do you think we should do if you think the standard is unclear? Wouldn't we have to remand it to the agency to require them to articulate a standard? We can't do it for them, can we? I don't think the court can do it for them. So the best that you could achieve here, it would seem, would be a remand to articulate in a published decision the current standard and then apply it. On the issue of vagueness and also what we think is a violation of the protocol, that's the outcome we're looking for. I don't think the court can do anything more than that. Because it seems to me that at least potentially, no matter how clear it's made, your client may still lose. It may be. If the agency comes up with a standard that it's willing to apply in all cases and it concludes that my client doesn't meet the standard, well, then I think you could review that decision under the judo language. You're saying that if a matter of LS is still good law, he wouldn't lose because nobody was actually injured? That's right. And because there was this invocation of this, perhaps because of the, it wasn't totally clear to me that the IJ at least was actually relying on the police report as the definitive explanation of what happened, or at least the government wasn't. And that's why the government started this notion of a danger to the general administration of justice, which running away was whether he took a fighting stance or whether he dodged through traffic or not. So pulling that factor out, which as far as I know hasn't been seen before, kind of eliminates the need to worry about the specific dangerousness factor, but we don't know to what degree that was operating either. We agree. And the board has never issued a president decision about dangers to the administration of justice. So we don't have a decision to look back at and say, well, that's one of the factors the board has said we can consider or can't consider. What does that mean, danger to the administration? Judge Ferguson, you've got me. I don't know what that means. Apparently, what I understood Judge Cassidy to say may not be Judge Cassidy. That prompted the motorcycle officer to chase after your client. Apparently, there was a report or a call that somebody had committed petty theft at the Rite Aid and was leaving. And the police officer received the report probably over his- He was running away after his theft. That's correct. And the officer pursued. That's correct. At the end of the day, we think Judy Lang should cause this panel to give a hard look to our precedents about particularly serious crimes, because if it is discretionary, as the ARBID panel decision did say it was discretionary, the agency has to consider the alien's fitness to reside in the country. But they are doing that. I mean, it's not like Judy Lang, where you have a standard that looked at two people who did exactly the same thing and said, you know, this person can stay and this person has to leave because of what the charging scheme was. And that's the respect in which it had nothing to do with whether they had a fitness to stay in the country. I mean, you can say that they haven't come up with a coherent standard of what makes somebody fit to stay in the country, but they're at least trying to do that. I mean, they're not looking at something that has nothing to do with their fitness to stay in the country. But what they are doing is making that determination on an individual ad hoc basis without apparently any anchor. I think that's true, and I'm out of time, but I think if you go back to dangerousness, and if we invoke dangerousness in our brief and their brief says, yeah, but we have discretion, I think the court has to take a hard look at if it's not dangerousness, and if you're just talking about you have sort of willy-nilly discretion to wield it as you please, Judy Lang means something, and it means that discretion can be abused. I think it's been abused in this case. You're going to find me a citation later. I will. Thank you. Good morning. Kate DeAngelis for the government. The court should deny the PFR in this case because the petitioner is ineligible, as we've been discussing, for withholding of removal. And under the abuse of discretion standard, the agency did not act arbitrarily, irrationally, or in contrary to law in determining that the crime was, in fact, a particularly serious one. Well, in two sentences, what is the standard that the agency applies in determining what a particularly serious crime is? In two sentences. Well, five sentences. Any sentence. Well, I think, you know, what this court has done, and what the agency does is they look at the frontescue factors. What does that mean? When you have factors, you have to have factors that you consider in order to determine X. What's X? Well, I think X is the attorney general's determination of whether he feels the crime is particularly serious. I think there... I.e., that this otherwise mandatory rule with regard to withholding is completely, in fact, if you have anybody who's committed any crime, completely discretionary. There is no standard. I think there is a discretionary element, as there is throughout the INA. I mean, it's not uncommon for the attorney general to have discretion to make determinations and phrases that are not defined in the INA. For example, persecution... Well, that's true, but this particular one traces back to a treaty obligation, which, as I recall having looked at the background material at one point, has a notion of a particularly serious crime being what it sounds like, not just a serious crime, but a particularly serious crime, I.e., a fairly quite small piece of the larger set of crimes. It seems to me the way the agency is applying this now, 90% of the crimes that people commit are in it. Is that not true? I mean, I can't say a percentage. I mean, I can only really look at... A very large percentage. I think that this is a case-by-case analysis that takes many factors into consideration, and I don't think it's simple to compare all the crimes that exist and say that 90% of them are going to be... Let's take the concept of probable cause, okay? Probable cause is a not very well-defined concept, but we nonetheless think of it as being a legal concept. There are factors that go into it, but we make some attempt to articulate what it means and to apply it in a way that has some legal consistency. Right. Is the agency doing that here? Has it ever put into words what a particularly serious crime is as opposed to what factors you use to find it? Right, and I think the obvious answer to that directly is no. The agency has not specifically defined the phrase. They have given guidelines, and the board has adjudicated cases, and it's within that, and the court has as well, and it's within that framework that the court reviews the agency's determination. I mean, that's the state of the law right now. I don't believe that there is a case where the agency has defined the term particularly serious. And if we were to go through and find out that a particularly serious crime has turned out to be so broad that it is, you know, at most crimes, wouldn't that be some clue that it's not particularly serious anymore? You know, if there were a situation where the court were reviewing many cases at once, I suppose that could be... Or ask the board to go back and look over all of what it has wrought and figure out whether there is really any sense in which these crimes are particularly serious. Well, I mean, to do that, you know, here, in this case, the court, of course, could do that, and it would require the court to look at all the factors that were considered and determine that the agency did abuse its discretion. And, of course, the court can do that here. Well, that's one option. But another option is to say, agency, you need to give us some clue what the center of this concept is. And there is something in the statute that gives you a clue, which is reference to dangerousness. What is your understanding of what the board's done with that? Well, I think that the board has really moved the particularly serious crime determination away from the dangerous prong. How do you do that? It's in the statute. Well, they've made it, you know, a regulation stating that once the attorney general determines that the crime is particularly serious, that there's a presumption. So making it a presumption sort of takes that analysis out. The court, in the first instance, is not looking at whether the crime is, you know, a danger to the community. He's looking at whether the crime is a particularly serious one, and he's looking only at that one specific crime that's at issue in the case. Why was this one particularly dangerous? Because this person wouldn't respond to the command of a police officer. Well, I think that what the immigration judge and what the board was saying was that, you know, he created a danger. He ran into traffic, and they listed, you know, several reasons why they felt that this was particularly serious. Is there evidence to support the underlying finding that the petitioner shoved the officer who fell backwards into a planter box, or at, it's unclear whether into, but against the planter box? Is there factual support for that? That information actually comes from a police report that is contained in the record. I don't have the pinpoint citation to it in the record right now, but that's the police officer's recollection that he recorded in the police report. But that, of course, is another odd thing, because this is why we have trials, right? If we just believed every police report, we wouldn't have to have any trials. Here, there was no trial, and we don't really know whether that police report happened. So, I mean, this is a result not of the decision in this case, but in the decision in, what is it, NAM? That says that, and the Ayala case, which proved it. But this is a good example of the fact that what you have is one person's written statement. He was not there. He wasn't cross-examined. Right. I mean, this is a. . . Not what he was, he wasn't convicted of doing those things. The police reports are generally not admitted to evidence. Well, this, you know, in the immigration context, of course, the evidentiary rules are relaxed. The statement I made was correct, right? I don't believe that's correct, because in this case. . . I'm not talking, I'm just talking generally. Well, generally, in particularly serious crime determinations, police reports are permitted and allowed in. I'm not talking about the immigration situation. Generally, they're not admitted to evidence. I generally, I can't answer that, I'm sorry. I'll just check that out. You can file a supplemental memorandum, all right? On whether generally police report. . . Yeah, yeah, I mean, I learned that in law school a long time ago. Okay, I just, it's not something I'm prepared to, you know, address today. I mean, this is all an educational experience. Okay, yes. Especially with my two colleagues here. Yes, it is. Yeah, and so. . . You know, I've had experience with other matters where people were fleeing. People on motorcycles, or people were fleeing from officers on motorcycles. And, you know, all we're talking about is some standards as to what's dangerous. And what you're telling us is whatever the Attorney General says is dangerous. That's it. And so he's making our life easy, and we just ought to bow our heads and accept it. Well, I mean, I think, you know, there is an abuse of discretion standard here. So the court is, you know. . . For sure. So how do you decide whether there's an abuse of discretion? Well, you look to see whether, you know, whether the agency's decision was arbitration. . . How can you do that with no central concept at which you're trying to figure out they're abusing the discretion with regard to? I absolutely do not understand that. Right. Well, I do think that, you know, this provision was intended to be a case-by-case analysis. And I do think that defining a specific standard could, you know, take some of the discretion away, you know, obviously, to look at all of the factors. . . That's true. It is a nondiscretionary form of relief. That's true. And it appears from the history in the treaty that there was a very narrow exception for very dangerous people. That's why it has to be particularly serious. So it does not appear that that's how the agency is administering it. It's administering it so that a particular serious crime is whatever we say it is, as long as we recite the right factors. I would agree with you that that's what the agency is doing, and that's what they are able to do under the statute the way it's drafted right now. I do believe that when they drafted the withholding statute that there was a provision in there for the Attorney General to retain a certain amount of discretion in the withholding provision. Well, we held in Delgado that it did not expressly delegate discretion to the Attorney General. Recently the court held that it's still discretionary, but my understanding is that the reason it's discretionary is because there is no standard. So then we're back to the vagueness problem. I mean, I have to agree that there is not a black and white standard. If some . . . the board tomorrow decided that . . . Well, there was a drunk driving case, for example, which was Delgado, that drunk driving is a particularly serious crime. And we wanted to . . . somebody wanted to know where are you getting that from or what's somebody going to do tomorrow? Right. Well, I think since the focus that Congress in drafting the statute has put on the crime itself and the exact circumstances that surrounded the particular crime at issue, again, I think that the point was for the agency to look at all of the circumstances and make a determination and to be able to look beyond. Was Mr. Alphonsus convicted of running through traffic? No. Was he convicted of punching a police officer? No. So how can we say that he was convicted by a final judgment of the particularly serious crime of punching a police officer and running through traffic so that there was a danger to traffic? Well, again, we can say that he was convicted of resisting an executive officer and then were allowed to bring in these extraneous documents and were allowed to look at them to make this discretionary determination. But those things had nothing to do with the crime. I mean, they were not the crime of which he was convicted. They were the circumstances surrounding the crime of which he was convicted. Right. You know, and under the statutory and regulatory scheme and under the agency decisions that exist right now at this point in time, I believe it was a proper analysis in this case, whether there are broader issues about needing to change. Suppose somebody was convicted of petty theft, but he had a gun on him when he was doing the petty theft. And so that was written up in a police report, and the BIA said that was a particularly serious crime. It was petty theft, but he had a gun that made it particularly serious. Right. Would that be okay? I believe that, you know, not knowing all of the other circumstances, I believe it probably would be okay. Even though he wasn't convicted of having the gun. There was a police report that said he had a gun, but he wasn't convicted of having the gun. Right. Under the rubric that exists right now, I do believe that, you know, given the proper circumstances in a case like that. So it's not only divorce from particularly serious. It's also divorce from a conviction. It doesn't have to be what he was convicted of, and it doesn't have to be particularly serious, and it doesn't have to have any center at all. Well, I, you know, I believe it has to be ancillary to the conviction. You know, carrying the gun during the burglary, for example, or, you know, here pushing the officer running into traffic in the opposite direction that the traffic was flowing. You know, those types of things are, they're related to the offense. They're not totally, you know, arbitrary. They're not necessary elements of the offense, but they were part of the offense conduct. Right. In your view, they would still have to be part of the same transaction, essentially. I believe that for purposes of, you know, that the agency set up to analyze particularly serious crimes, yes, it's appropriate to consider all those circumstances. Well, somebody was an embezzler who had a gun. I mean, I don't, it's really quite mysterious. I mean, I have to agree that there could be a bright line rule, and there is not. But I also have to. It has to be a bright line rule. It has to be a wavy line rule. There isn't even a wavy line rule, right? Right. Well, you know, again, under the circumstances that we have here and with the legal construct that we have, I do have to. Well, but, you know, we do a lot of things in this immigration context that I think are particularly disturbing. We allow disbarred lawyers to practice before the immigration court, don't we? I believe we do until the agency disbars them. Yeah, and if you look at some of our cases, if you look at 100 of them at random, you'll probably find, I'll be very conservative, that 40% of them have incompetent lawyers. And the Justice Department knows about it. The Immigration Service knows about it. The IJs know about it because they see these rascals every day. And yet we do nothing about it. Well, I would have to argue that that's not the case here. It's like my opposing counsel was quite competent. Oh, yeah, this guy's a star, I'll tell you that. Yes, agreed. Yeah, yeah, one of the best I've had appear before. I agree. We see a wide range of briefs in our office. Yeah, yeah, so he's got some passion behind what he does, and we need people like that because I don't want to go on. You can read some footnotes. Just one last thing. What about the matter of LS and the statement that because there wasn't an actual injury, it wasn't a particularly serious crime? Is that out the window, or did it not say that, or is it not binding anymore for some reason, or what? Well, I believe that under, you know, Frantescu and NAM and Arbid and Delgado and this Court's decisions, that that is just not one of the factors that we're looking at. They never actually overruled it. It went away somehow. I would have to double check, but I'm not sure that the regulation, I guess the regulation didn't supersede. I mean, the regulation is in place making the dangerousness a presumption, and NAM has said that you don't need to consider dangerousness in the first instance when determining. It's not a question of considering dangerousness. It's whether in defining what a particularly serious crime is, the dangerousness is an element of the nature of the crime. In other words, it tells you something about what kind of crimes we're talking about. Right. And that's what I understood LS to mean. Right. I think to the extent that the Court has repeatedly referred to the Frantescu with the NAM amendments, I think that's the law in this circuit, and I think... You think LS is gone? You know, to the extent that the Court hasn't relied on LS, especially recently... The Court's not the question. The question is what does the BIA think it's doing? I think the BIA has set forth the factors that it wants the Court to review and that it wants the agency to use, and that's Frantescu and NAM. And I don't have an answer for whether LS is something that the agency is still using. I believe it's clear that they are using Frantescu and NAM. If there are no further questions, I'll just leave. Okay. Thank you. Thank you very much. You've been very helpful. Thank you. I don't think I have any more time here. Oh, I have three minutes left. No, you're minus three. Minus three, okay. I just wanted to give Judge Graber the citation. That'd be great. 8 U.S.C. 1231 B.3.B. I.I. So I.I. is the exception to the withholding statute. It says, if the Attorney General decides that the alien, having been convicted of a final judgment of a particularly serious crime, is a danger to the community of the United States. Why don't you write those down on a gum sheet? I will, and they're at page 19 of my brief. It's just the statute that we're talking about, and it seems at least to elicit some sense that whether it's a particularly serious crime is useful in the judgment of whether the person is dangerous. We think so. Okay. Do you specialize in this field? Yes. Under Kansas law, I'm not allowed to say I specialize in this field under my ethics rules, but I do practice solely immigration. I wish that in Kansas City. Yes. You weren't appointed by this court, were you? I was not appointed by the court. No, the BIA has a pro bono project, where it will designate certain cases that need pro bono attorneys. That's how we got involved. Well, I agree that you've done a lovely job. Okay, well, thank you very much. Both counsel, I really appreciate your arguments today. All right. Can we come to the Sierra?
judges: Pregerson, Graber, Berzon